2024 IL App (1st) 231389-U

No. 1-23-1389

Order filed October 30, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| TCRG SN4057, LLC, | ) | Appeal from the |
| | ) | Illinois Independent Tax |
| Plaintiff-Appellant, | ) | Tribunal. |
| | ) | |
| v. | ) | No. 22 TT 04 |
| | ) | |
| ILLINOIS DEPARTMENT OF REVENUE and | ) | |
| ILLINOIS INDEPENDENT TAX TRIBUNAL, | ) | Honorable |
| | ) | Brian F. Barov, |
| Defendants-Appellees. | ) | Judge, presiding. |

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court.
Justices Reyes and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Where the corporate taxpayer brought an action against the Illinois Department of
              Revenue, alleging that the use tax imposed on the purchase price of an airplane
              under the Use Tax Act (35 ILCS 105/1 *et seq*. (West 2022)) was unconstitutional,
              the taxpayer owed the use tax, along with associated penalties and interest.

¶ 2    After defendant Illinois Department of Revenue (Department) assessed against plaintiff

TCRG SN4057, LLC (TCRG) a use tax on TCRG's jet aircraft under the Use Tax Act (Act) (35

ILCS 105/1 *et seq*. (West 2022)), TCRG sought review before the Illinois Independent Tax

Tribunal (Tribunal). TCRG and the Department filed cross-motions for summary judgment. The Tribunal entered summary judgment in part in favor of the Department, concluding that TCRG owed use tax on the aircraft, along with associated penalties and interest. The Tribunal also entered summary judgment in part in favor of TCRG, concluding that TCRG did not owe a Cook County use tax.

¶ 3    TCRG filed this action for direct administrative review, arguing that the imposed use tax is unconstitutional because (1) TCRG and its aircraft lacked a substantial nexus to Illinois, and (2) the tax is not fairly related to the services provided by Illinois. TCRG also argues that it is entitled to an abatement of penalties and an award of attorney fees.

¶ 4    For the reasons that follow, we affirm the judgment of the Tribunal and deny TCRG's request for attorney fees.[1]

¶ 5                          I. BACKGROUND

¶ 6    TCRG is a limited liability company formed in Delaware in November 2015. It is a wholly-owned subsidiary of Texas Capitalization Resource Group, Inc., which has a principal place of business in Texas. The Department is the Illinois administrative agency responsible for administration of the Act. *See* 35 ILCS 105/1 *et seq.* (West 2022).

¶ 7    On December 18, 2015, the month after TCRG's formation, TCRG purchased a Gulfstream G450 Jet (the aircraft) for $16.5 million from Gulfstream Aerospace Corp. TCRG took delivery of

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

the aircraft that same day in Connecticut. TCRG has not paid any sales or use tax to any state relative to the aircraft.

¶ 8    On the aircraft's bill of sale, TCRG was listed as the purchaser, with an Illinois address of 227 West Monroe, Suite 4900, Chicago, Illinois 60606 (the Franklin). The aircraft's registration application, which was filed with the Federal Aviation Administration (FAA) and signed on the date of purchase by the president of TCRG's parent, also listed TCRG's address as the Franklin.

¶ 9    TCRG retained Franklin Monroe Administrative Services, LLC (Franklin Monroe) to oversee and manage the operation and administration of TCRG's aircraft fleet. Franklin Monroe's address was the Franklin. The managing director of Franklin Monroe was Matthew Sennett.

¶ 10    On December 15, 2015, three days prior to TCRG's purchase of the aircraft, TCRG entered separate leases of the aircraft with Guggenheim Capital, LLC (Guggenheim), a Delaware limited liability company, and Executive Jet Management (EJM). TCRG entered still another lease with Guggenheim on February 29, 2016. EJM is described in its lease with TCRG as operating a "charter business." The lease lists Guggenheim and TCRG's parent as "lessor affiliates" with whom TCRG negotiated "discounted EJM charter rates."

¶ 11    In the two Guggenheim leases, Guggenheim's address was listed as the Franklin. Guggenheim's chief legal officer certified that Guggenheim would be "responsible for operational control of the aircraft." TCRG, as lessor, was obligated to repair and maintain the aircraft during the one-year lease terms. The leases stated that notices to lessor TCRG should be sent to Sennett at the Franklin and notices to the lessee Guggenheim should be sent to its chief legal officer, who

was also located at the Franklin. The "Governing Law" sections of the leases state that they are "entered into under" and "to be construed in accordance with, the laws of the State of Illinois."

¶ 12    In the EJM lease, TCRG was identified as the registered owner of the aircraft with an address of the Franklin. The "Home Airport Location" of the aircraft was listed as Midway Airport. Section 1 of the lease states that the intent of the parties is for EJM to use the aircraft in its charter business to generate lease payments to TCRG for TCRG's "financial benefit." In Section 1 of the lease, the response "Yes" is listed in answer to item 1.e, "Is Lessor [TCRG] an aircraft-ownership entity with no other assets or business operations of its own?"

¶ 13    Also, in the EJM lease, where Guggenheim was identified as a lessor affiliate, its address was the Franklin. TCRG was listed as the registered owner of the aircraft with a "principal place of business" at the Franklin. Sennett of Franklin Monroe, with an address of the Franklin, was listed as TCRG's representative. Sennett's name, the Franklin address, and other contact information were listed for providing "notices relating to security, medical emergency, or accident response matters." TCRG's maintenance representative was listed as Ryan Majchrowki of Jen-Air, LLC, listed with a Chicago address. The EJM contacts for receiving notices under the lease had addresses or area codes for Cincinnati, Ohio.

¶ 14    After its purchase, TCRG flew the aircraft to Wisconsin, where it spent 75 days undergoing repairs. On March 2, 2016, the aircraft was flown to Cincinnati, Ohio for "Part 135 Certification."[2]

---

[2]Part 135 of title 14 of the Code of Federal Regulations sets forth requirements for airworthiness for aircraft. *See* David T. Norton, *Don't Put Your Client's Shiny New Corporate Jet Into A Sole-Asset L.L.C.*, 65 Tex. B.J. 314, 317 (2002) (citing 14 C.F.R. § 135 (2002)).

Following certification, for over a two-month period from March 3 through May 17, 2016, the aircraft had what Sennett referred to as a "temporary home" at Atlantic Aviation MDW, its fixed base operator ("FBO") [3] at Midway Airport. During this period, Jen-Air performed 200 hours of aircraft maintenance.

¶ 15    Within the first year following its purchase, of 145 flights, the aircraft flew in and out of Illinois 44 times (using Midway, DuPage, and Waukegan airports) and was on the ground in Illinois for 71 days. During its two months of maintenance that year, the aircraft flew Guggenheim employees in and out of Midway 12 times. Beginning in May 2016, the aircraft was relocated to "its permanent place at a hangar" at Stewart International Airport in New York, where the airplane was based to transport local executives. In 2018, when TCRG decided to base the aircraft in Illinois, it sought a rolling stock exemption[4] for the aircraft, prompting a Department audit.

¶ 16    In December 2020, the Department issued a notice of proposed audit findings and proposed audit liability with respect to the aircraft. In February 2021, TCRG requested an informal conference board review. TCRG later declined to continue the process before the informal conference board. That fall, the Department issued a notice of use tax liability in the amount of

_____

[3]An FBO is "an individual or firm operating at an airport and providing general aircraft services such as maintenance, storage, ground and flight instructions, etc." *Miller Aviation v. Milwaukee County Board of Supervisors*, 273 F.3d 722, 726 (7th Cir. 2001) (citing Order 5190.6A, *Airport Compliance Requirements,* DOT, Federal Department of Aviation (October 2, 1989)).

[4]The rolling stock exemption allows for an exemption from use tax where the aircraft "has carried persons or property for hire in interstate commerce for greater than 50% of its total trips for that period or for greater than 50% of its total miles for that period." 35 ILCS 115/2d(e) (2022).

$1,196,250. The Department further assessed penalties in the amount of $239,500.50 and interest in the amount of $278,622 for a total assessment of $1,714,372.50.

¶ 17    TCRG thereafter filed a petition with the Tribunal challenging the assessment. Following discovery, the parties filed cross-motions for summary judgment, supporting exhibits, replies in support, and supplemental briefing. In its motion, TCRG asserted that the use tax assessment violated the commerce clause of the United States Constitution, claiming that (1) TCRG did not have a substantial nexus to Illinois, and (2) the tax was not fairly related to services offered by Illinois. In addition to challenging the tax, TCRG also sought an abatement of penalties.

¶ 18    In July 2023, the Tribunal entered summary judgment in part in favor of TCRG on the issue of the imposition of a 1% Cook County use tax, which the Department does not challenge on appeal. The Tribunal also entered summary judgment in part in favor of the Department as to both the constitutional issues and the penalties. First, the Tribunal concluded that the "more *** than a slightest physical presence" standard necessary to satisfy substantial nexus was easily established in this case. The Tribunal noted the following. TCRG had used an Illinois address both when purchasing the aircraft and registering it with the FAA. TCRG leased the aircraft to Guggenheim, "an Illinois-based company with Illinois offices," for its use. Employees of Guggenheim used the aircraft at least a dozen times. The leases, in turn, were managed by TCRG's Illinois-based representative, Franklin Monroe. Franklin Monroe held out both TCRG and the aircraft as based in Illinois and oversaw 200 hours of repairs by an Illinois company at Midway airport over the course of several weeks. Furthermore, for an over nine-month period after the aircraft was brought

into Illinois, 30% (44 out of 145) of its flights took off or landed in Illinois and it spent 71 days or 19.5% of its ground time there.

¶ 19　Next, the Tribunal determined that the tax was fairly related to the services provided by Illinois because the aircraft made extensive use of Illinois's airports and TCRG benefited from "Illinois' entire physical and social infrastructure" that supported the lease transaction. Lastly, the Tribunal denied TCRG's request for an abatement of penalties, concluding that its constitutional arguments were not based on a good faith determination of tax liability because the settled law clearly refuted TCRG's "overly narrow and restrictive" view of the substantial nexus test and TCRG disregarded both Illinois's "considerable involvement in regulating air transportation" and the benefits that TCRG received generally from Illinois's services in aid of TCRG's economic transactions.

¶ 20　TCRG filed a petition for review.

¶ 21　　　　　　　　　　　　　　　II. ANALYSIS

¶ 22　This matter comes before us in the context of cross-motions for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2–1005(c) (West 2022). The parties agree that there are no genuine issues of material fact raised in their cross-motions for summary judgment and that the case may be resolved as a matter of law. We review appeals from summary judgment rulings *de novo*. *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 93 (2010).

¶ 23                                    A. The Use Tax Act[5]

¶ 24    The Act taxes the use of personal property in Illinois. See 35 ILCS 105/3 (West 2022) ("A tax is imposed upon the privilege of using in this State tangible personal property purchased at retail from a retailer ***"). This use tax complements the Retailers' Occupation Tax Act (35 ILCS 120/1 *et seq.* (West 2022)), which imposes on Illinois retailers a "retailers' occupation tax" for the sale of personal property within Illinois (*id.* § 2 (tax imposed "upon persons engaged in the business of selling at retail tangible personal property")). A use tax places Illinois retailers on equal footing with out-of-state retailers by subjecting a purchaser's use of property to taxation, regardless of whether it is purchased from an Illinois retailer or an out-of-state retailer. See *Container Corp. of America v. Wagner*, 293 Ill. App. 3d 1089, 1092 (1997) ("use tax is assessed regardless of where purchase is made"). In cases, like here, where property is purchased from an out-of-state retailer that has not collected use tax on the sale, "the user in Illinois must pay the use tax directly to the state." *Irwin Industrial Tool Co. v. Illinois Department of Revenue*, 238 Ill. 2d 332, 341 (2010).

¶ 25    TCRG does not argue that it did not use the aircraft in Illinois for purposes of application of the Act. Nor could it, as the record demonstrates that TCRG used the plane by leasing it to Guggenheim, a company located in Illinois. See *Philco Corp. v. Department of Revenue*, 40 Ill. 2d 312, 316-18 (Ill. 1960) (lease of property for use in Illinois is a taxable use); see also *Revenue*

---

[5]Although the Tribunal's July 2023 order indicates that the Department's use tax case is based on the Aircraft Use Tax Law (35 ILCS 157/10-1 *et seq.* (West 2022)), the Department clarified in its brief in support of its cross-motion for summary judgment before the Tribunal that the use tax case is based on the Act (35 ILCS 105/1 *et seq.* (West 2022)). TCRG stated in its summary judgment brief to the Tribunal that although the Department had been unclear whether it was proceeding under the Aircraft Use Tax Law or the Act, the analysis under either law for purposes of the parties' cross-motions for summary judgment was similar.

*Cabinet v. Ashland Oil, Inc.*, 888 S.W.2d 701, 701-02 (Ky. Ct. App. 1994) (noting use tax on aircraft upheld where taxpayer had leased aircraft to in-state corporation).

¶ 26 Instead, TCRG challenges whether the tax was constitutionally permissible under the commerce clause of the United States Constitution, which authorizes Congress to "regulate Commerce *** among the several states." U.S. CONST. art I, § 8, cl. 3. The commerce clause has been deemed as "implicitly containing a negative command, known as the dormant commerce clause, which limits the power of the states to tax interstate commerce." *Irwin Industrial Tool Co.*, 238 Ill. 2d at 341. "To withstand a claim that it has unconstitutionally burdened interstate commerce, a state tax must satisfy the four-part test enunciated in *Complete Auto Transit, Inc. v. Brady*, [430 U.S. 274 (1977)]." *Irwin Industrial Tool Co.*, 238 Ill. 2d 332 at 341. Under this test, the tax must "(1) be applied to an activity with a substantial nexus with the taxing state; (2) be fairly apportioned; (3) not discriminate against interstate commerce; and (4) be fairly related to the services provided by the state." *Id*.

¶ 27 TCRG raises a constitutional challenge only with respect to the first and fourth elements, arguing that TCRG and its aircraft lacked a substantial nexus to Illinois and that the tax is not fairly related to the services provided by Illinois. This court has recognized that a "party raising a commerce clause challenge to a state tax scheme carries the burden of persuasion." *Town Crier v. Department of Revenue*, 315 Ill. App. 3d 286, 292 (2000).

¶ 28                           1. Substantial Nexus

¶ 29 TCRG argues that it is not subject to the use tax because (1) it is not an Illinois entity and does not have any Illinois employees, Illinois offices, or Illinois business operations, (2) the alleged

nexus of "unrelated third parties" to Illinois cannot be attributed to TCRG, and (3) the aircraft was flown in and out of Illinois by third-party lessees, not TCRG, a fraction of the time compared to applicable Illinois precedent.

¶ 30                                  a. Physical Presence

¶ 31    In *South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 170 (2018), the Supreme Court overruled *Quill Corp. v. North Dakota*, 504 U.S. 298, 311 (1992), which had held that a taxpayer must have a physical presence in a state to satisfy the substantial nexus requirement of *Complete Auto*. *Wayfair, Inc.*, 585 U.S. at 178, made "physical presence *** not necessary to create a substantial nexus." Rather, all that is required under the first element of *Complete Auto* to establish a substantial nexus is whether the taxpayer " 'avails itself of the substantial privilege of carrying on business' in that jurisdiction." *Id.* at 188.

¶ 32    Here, the parties had agreed before the Tribunal that *Wayfair*'s substantial-privilege-of-carrying-on-business test did not apply outside the remote seller context. Accordingly, the Tribunal applied the physical presence test of *Quill* in resolving this case. However, despite that stipulation, the Department argues on appeal that certain authorities have determined that *Wayfair* may apply in this matter. Specifically, the Department first contends that commentators have noted that *Wayfair* is not limited to its facts and applies generally as to the interpretation of the substantial nexus element of *Complete Auto*. See Adam Cline and Caleb Allen, *The Wayfair Decision and Washington State's Nexus Laws*, 29-Mar J. MULTISTATE TAX'N 30, 33 at n.26 (" 'The commerce clause and the Court's dormant commerce clause jurisprudence are constitutional law. As a result, a holding that changes the Court's commerce clause doctrine, such as *Wayfair*, applies to all states

and localities and all SALT [state and local tax] regimes.' ") (quoting Jaye Calhoun and William J. Kolarik II, *Implications of the Supreme Court's Historic Decision in Wayfair*, Tax Analysts, July 9, 2018). Second, the Department contends that at least one tax court has noted that *Wayfair* must have retroactive effect based on United States Supreme Court command. See *Global Hookah Distributors, Inc. v. Department of Revenue*, 24 Or. Tax 562, 584-86 (2021) (citing *Harper v. Virginia Department of Taxation*, 509 U.S. 86, 97 (1993) ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and *must be given full retroactive effect in all cases still open on direct review and as to all events*, regardless of whether such events predate or postdate our announcement of the rule." (Emphasis in original.))

¶ 33    TCRG argues that the Department has waived review of this issue pursuant to the parties' stipulation before the Tribunal regarding the inapplicability of *Wayfair*.

¶ 34    Even if we were to deem the parties' stipulation—that *Wayfair* does not apply—incorrect, consideration of *Wayfair*'s less exacting standard for substantial nexus is not required here because even though a physical presence is no longer necessary under *Wayfair*, it is sufficient to establish nexus. See Professor Richard D. Pomp, *Wayfair: Its Implications and Missed Opportunities*, 58 WASH. U. J. L. & POL'Y 1, 51 (2019) ("a physical presence is not a necessary precondition for nexus, but it remains a sufficient condition"). As explained below, the activities of TCRG (and its aircraft) satisfy the physical presence necessary under pre-*Wayfair* jurisprudence to establish substantial nexus.

¶ 35                              i. "More Than A Slightest Presence"

¶ 36    As noted, under *Quill*, a taxpayer was required to show a physical presence in the state to establish nexus. 504 U.S. at 317-18. But the Illinois Supreme Court twice clarified that this presence "need not be 'substantial.' " *Irwin Industrial Tool Co.*, 238 Ill. 2d at 342 (quoting *Brown's Furniture v. Wagner*, 171 Ill. 2d 410, 424 (1996)). Rather, the presence must be "more than a 'slightest presence.' " *Id.*

¶ 37    In deciding that a substantial physical presence is not required to pass constitutional muster, *Brown's Furniture*, 171 Ill. 2d at 423-24, held that New York's highest court "stated *** correctly *** the rule regarding substantial nexus" in *Orvis Co., Inc. v. Tax Appeals Tribunal*, 654 N.E.2d 954 (N.Y. 1995). Specifically, in *Orvis*, the court determined that "more than a 'slightest presence' " does not require a substantial physical presence and can be met by "the presence in the taxing State of the vendor's property or the conduct of economic activities in the taxing State performed by the vendor's personnel or on its behalf." *Orvis*, 654 N.E.2d at 960-61; see *Brown's Furniture*, 171 Ill. 2d at 424.

¶ 38    Under this standard, the court in *Orvis* (in consolidated appeals) examined whether two out-of-state vendors had an obligation to collect New York use tax on mail order sales to New York customers. 654 N.E.2d at 955-96. The vendors had no permanent physical presence in New York, but their employees visited there for business purposes. *Id.* at 955-56. One vendor's personnel would visit its wholesale customers an average of four times per year, and the other vendor visited customers for computer troubleshooting on 41 occasions over three years. *Id.* at 962. With respect to the troubleshooting services, the court noted that these visits helped the vendor

"establish and maintain" a market in New York. *Id.* Accordingly, the court held that these contacts with the state satisfied the nexus requirement. *Id.*

¶ 39    In *Brown's Furniture*, 171 Ill. 2d at 414, 424-24, the Illinois Supreme Court followed the reasoning in *Orvis*, concluding that the taxpayer had a substantial nexus despite it having no offices, plants, or permanent employees in Illinois. In addition to the deliveries of furniture made by the company to Illinois, the supreme court also looked to the taxpayer's advertising activities in Illinois as establishing presence there. *Id.* at 427. The supreme court noted that the taxpayer "establish[ed] and maintain[ed] a market" through its deliveries and that its advertising activity was not "incidental" but rather helped procure a consumer market in Illinois. *Id.* at 425, 427. The supreme court also cited with favor two out-of-state statutes setting forth requisite minimum contacts to establish nexus, each requiring delivery within the state more than 12 times. *Id.* at 425 (citing Va. Code Ann. § 58.1–612(C)(4) (Michie Supp. 1995) and Code Me. R. § 08–125 (sales tax section Rule 311) (1994)). Importantly, *Brown's Furniture* also described the type of activity that would not constitute sufficient nexus as "occasional," "sporadic," or "incidental." *Id.* at 426-27.

¶ 40    After *Brown's Furniture* was decided, this court decided *Town Crier*, 315 Ill. App. 3d at 294, holding sufficient physical presence existed where an out-of-state furniture company made 30 deliveries to Illinois by using its own trucks during the 26-month audit period. Although *Town Crier* noted that the deliveries were "markedly less numerous" than the 942 deliveries involved in *Brown's Furniture*, this court noted that the 30 deliveries were sufficient to satisfy other states' requirements, referenced by *Brown's Furniture*, which required just 12 deliveries or more. *Town*

*Crier*, 315 Ill. App. 3d at 293-94. *Town Crier* further noted that *Orvis* found sufficient nexus where there were only 41 visits in a three-year period. *Id.* at 294. Like *Brown's Furniture*, this court in *Town Crier* noted that the vendor's deliveries "enhanced its ability to establish and maintain a market" in Illinois. *Id.*

¶ 41    Furthermore, the United States Supreme Court has made clear that the taxpayer's representatives establishing a physical presence in the taxing state need not be employees. The Supreme Court has held that "[t]he showing of a sufficient nexus cannot be defeated by the argument that the taxpayer's representative was properly characterized as an independent contractor rather than an agent." *Tyler Pipe Industries, Inc. v. Washington State Department of Revenue*, 483 U.S. 232, 233 (1987) (citing *Scripto, Inc. v. Carson*, 362 U.S. 207 (1960)). *Scripto, Inc.*, 362 U.S. at 211, held that the vendor's use of independent contractors to solicit sales in the taxing state, as opposed to employees, made no constitutional difference. The local function of the contractor in "securing a substantial flow of goods" into the state remained unchanged. *Id.* Indeed, "permit[ting] such formal 'contractual shifts' to make a constitutional difference would open the gates to a stampede of tax avoidance." *Id.*

¶ 42    The above cases involved the use tax collection obligation of out-of-state vendors, but courts, including the Illinois Supreme Court, have also considered the substantial nexus issue in the context at issue here, involving a use tax on the use of aircraft. To that end, *Irwin Industrial Tool Co.*, 238 Ill. 2d at 342, evaluated whether there was substantial nexus to tax an aircraft's use in Illinois. As noted above, *Irwin* reiterated the test established in *Brown's Furniture* that physical presence need not be substantial, but rather more than slight. *Irwin Industrial Tool Co.*, 238 Ill. 2d

at 342. *Irwin* further held that to tax an activity, there must be a connection to the activity and to the taxpayer. *Id.*

¶ 43    In *Irwin*, several factors established a substantial nexus for the airplane, including (1) that despite being hangared in Nebraska, it had a frequent physical presence in Illinois, (2) its ownership by a company "whose corporate purpose" was to provide transportation services to its parent's employees, some of whom had offices in Illinois, and (3) that both the bill of sale and registration application with the FAA listed an Illinois corporate office. *Id*. at 338, 343. The court noted that the airplane's presence in Illinois was "not coincidental, but was inherent in its basic purpose and function in this state." *Id.* at 343-44 (evaluating "the significance of the airplane's presence inside the state, as it related to its purpose, function, and use").

¶ 44    In another factually similar case from the Supreme Court of Missouri, *Fall Creek Construction Co., Inc. v. Director of Revenue*, 109 S.W.3d 165 (Mo. 2003), the court held that a substantial nexus existed to impose a use tax on the company's fractional ownership interests in aircraft hangared out of state. *Id.* at 170-71. The court found determinative for substantial nexus the two aircrafts' departure or arrival 42 times in the state and 24 overnights there. *Id.* at 171.

¶ 45    We conclude that sufficient nexus existed between Illinois and both TCRG and the aircraft. With respect to TCRG, its principal place of business is repeatedly indicated throughout the record as the Franklin, including on the two pertinent places recognized in *Irwin*: the aircraft's bill of sale and its FAA registration application. See *Irwin Industrial Tool Co.*, 238 Ill. 2d at 343. The record also shows TCRG's formation, in November 2015, closely preceded purchase of the aircraft and subsequent lease of the aircraft in December 2015 to Guggenheim, a company also located in

Illinois at the Franklin. The EJM lease indicates that TCRG's sole purpose was to operate as an "aircraft-ownership entity with no other assets or business operations." The EJM lease then lists Guggenheim, located in Illinois at the Franklin, as one of two "lessor affiliates"—the other being TCRG's parent—that would be using EJM's charter services. The record discloses no other entity's use of the aircraft.

¶ 46　　Moreover, Franklin Monroe, also located at the Franklin, was, in their own words, hired by TCRG to "oversee and manage the operation and administration of [TCRG's] aircraft fleet." Additionally, Sennett (of Franklin Monroe) was identified as TCRG's representative in the EJM lease, and as the point of contact for notices. In this way, Franklin Monroe, just like the salespersons in *Orvis* and delivery personnel in *Brown's Furniture* and *Town Crier*, was conducting economic activities on TCRG's behalf and "enhanc[ing] its ability to establish and maintain a market." *Town Crier*, 315 Ill. App. 3d at 294. To that end, TCRG, through Franklin Monroe, entered leases with Guggenheim—both of which are entities located in Illinois. As the EJM lease stated, the leasing of TCRG's plane was for TCRG's "financial benefit."

¶ 47　　A physical presence also existed through TCRG's contract work with Jen-Air, also located in Chicago. That company helped ensure the operation of the aircraft, which again, was to TCRG's economic benefit. Additionally, Jen-Air performed extensive repairs at Midway for over two months.

¶ 48　　The aircraft itself also had the requisite physical presence in Illinois. For a nine-month period during the first year following purchase, the aircraft arrived and departed 44 times and spent 71 days on the ground, including for its extensive maintenance at Midway. Midway was listed as

the "Home Airport Location" in the EJM lease. Sennett also referred to the aircraft's FBO at Midway as its "temporary home." This presence is at least equal to, and arguably greater than, both the presence found sufficient in *Town Crier*, 315 Ill. App. 3d at 294, (*i.e.*, 30 deliveries over 26 months), and the contacts deemed sufficient by *Brown's Furniture*, 171 Ill. 2d at 425 (12 deliveries). The aircraft's presence also exceeds that found to be sufficient by the Missouri Supreme Court in *Fall Creek Construction Co., Inc.*, 109 S.W.3d at 168, with the planes there arriving and departing between 16 and 26 times and staying overnight between 11 and 13 times.

¶ 49   Importantly, the presence in this case exceeds what does not qualify as a substantial nexus—which the Illinois Supreme Court has described as "sporadic," "occasional," or "incidental" contacts with the state. *Brown's Furniture*, 171 Ill. 2d at 426-27. There was nothing sporadic about Frankin Monroe's permanent presence in Illinois, acting as TCRG's agent. And the aircraft's presence at Midway was not "incidental"—rather, it was deliberately stationed there for over two months to undergo necessary repairs to continue as a source of income to TCRG. Nor were TCRG's leases with Guggenheim incidental, where they occurred in conjunction with the purchase of the aircraft and involved a dozen trips carrying Guggenheim employees during the two-month maintenance period alone.

¶ 50                                    b. TCRG's Arguments

¶ 51   TCRG argues that *Scripto* and *Brown's Furniture* "do not directly speak to the issues here" because they did not involve aircraft use. But these cases—albeit in contexts that did not involve aircraft—do directly speak to the substantial nexus question as well as the facts here. Importantly, *Brown's Furniture* established that a taxpayer's personnel "conduct[ing] *** economic activities"

on its behalf can satisfy nexus, even if a taxpayer does not have a physical office in the state. 171 Ill. 2d at 414, 424, 425 (citing *Orvis*, 654 N.E.2d at 960-61). The fact that *Irwin*—an aircraft use tax case—happened to involve a taxpayer with offices in Illinois, does not, as TCRG claims, render *Brown's Furniture* inapplicable. As the Tribunal correctly noted, "nothing in the *Irwin* court's decision can be read to abrogate *Brown's Furniture*, limit *Town Crier*, repudiate *Orvis*, or undermine the [United States] Supreme Court decisions holding that substantial nexus can be supplied by non-employee representatives acting on the taxpayer's behalf or through the taxpayer's in-state conduct of economic activities." Indeed, in explaining the standard for nexus, *Irwin* relies on *Brown's Furniture*. *Irwin Industrial Tool Co.*, 238 Ill. 2d at 342. For this reason, we reject TCRG's claims that the Tribunal "erred by venturing outside of the aircraft context," and that a unique standard should apply to tax on airplanes. As the Tribunal recognized, there is nothing under constitutional law that places aircraft into their own unique and special category.

¶ 52     TCRG also asks this court not to focus on *Scripto*, which made clear that the personnel conducting economic activities in the taxing state—like Franklin Monroe and Jen-Air did here for TCRG—need not be employees. See *Scripto, Inc.*, 362 U.S. at 211. But TCRG's basis for distinguishing the case is simply that *Scripto* involved solicitation of consumers. Indeed, TCRG attempts to distinguish much of the jurisprudence on the substantial nexus question on the basis that the cases typically involve retailers. While this case does not involve a retailer, there is nothing to suggest that the cases analyzing the substantial nexus question in that context are not binding on the analysis here simply because they do not involve airplane use. Again, as noted above, *Irwin*—involving aircraft—cited cases involving retailers as setting forth the pertinent standards.

238 Ill. 2d at 342. Moreover, while TCRG is not in the business of selling physical goods, it is in the business of generating income, and its representatives' presence in this state to that end remains pertinent. As such, *Scripto* applies, and informs the nexus established by TCRG's representatives in Illinois. Moreover, because *Scripto* applies, TCRG's attempt to distinguish *Town Crier* and *Orvis* on the basis that those cases involved conduct of employees (as opposed to contractors) also fails.

¶ 53    TCRG also attempts to downplay Franklin Monroe's conduct in TCRG's economic activities by asserting that Franklin Monroe was responsible for handling "administrative functions," such as merely receiving notices and invoices. We reject this characterization. Sennett's own affidavit stated that Franklin Monroe was hired to "oversee and manage the operation and administration of [TCRG's] aircraft fleet." Moreover, far from merely making deliveries into the state or conducting customer service visits a set number of times per year—which has been found to be sufficient to establish nexus in *Brown's Furniture*, *Town Crier*, and *Orvis*—Franklin Monroe had an office in Illinois.

¶ 54    TCRG also asserts that no nexus should be found here because the flights into and out of Illinois in *Irwin* were more numerous than here. But TCRG ignores the Tribunal's salient point that *Irwin* did not establish a "constitutional floor for when flights or flight times convey more than the slightest physical presence." The Tribunal also noted this point in distinguishing the other case cited by TCRG, *Director of Revenue v. Superior Aircraft Leasing Co., Inc.*, 734 S.W.2d 504 (Mo. 1987), which this court discusses below.

¶ 55    TCRG makes no cogent argument as to why the question of substantial nexus in this case should revolve merely around how similar its facts are to those particular to *Irwin*. Regardless, as noted, *Irwin* looked to the aircraft's frequency in the state as it related to its "purpose, function, and use." 238 Ill. 2d at 344. The percentages of use here—30% of its flights taking off or landing in Illinois and 19.5% of its ground time in Illinois in the nine months after being brought into the state—met that standard. Also, as noted above, the aircraft's total flights and ground time in Illinois fit easily into the range of contacts deemed sufficient in *Town Crier*, *Orvis*, and *Fall Creek*.

¶ 56    TCRG also claims without support that because it lacks an officer in Illinois, which *Irwin* featured, greater presence of the aircraft is required. In any event, *Irwin* involved a plane hangared out of state and did not involve a period when the plane had a "temporary home" due to service and maintenance by an FBO in Illinois. Additionally, TCRG fails to distinguish *Irwin*'s consideration of the bill of sale and FAA registration identifying an Illinois address, which is also the case here. TCRG's claim that this address was provided for an "entirely administrative purpose" is supported only by citation to TCRG's petition and its counsel's own correspondence. Furthermore, in the fact section of its brief, TCRG asserts that Midway was listed in the EJM lease because the aircraft did "not yet have a permanent hangar in New York." But TCRG's citation is merely of its reply in support of summary judgment. Though the reply itself cites a second affidavit of Sennett, that affidavit is not in the record. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) ("Any doubts which may arise from the incompleteness of the record will be resolved against the appellant."). As noted above, the aircraft's function was to be leased to Guggenheim, a company located in Chicago, for its use.

¶ 57    Even though TCRG did not have officers in Illinois, TCRG's assertion that it "has no business operations in Illinois" is not supported by the record. The parties' actual stipulation for this claim reads: "From March 3, 2016 to May 17, 2016, TCRG had no business operations in Illinois." Thus, the stipulation states only that TCRG had no business operations in the state during the two-month period the aircraft was undergoing maintenance. TCRG's repeated partial quotation of this stipulation to suggest that it never had business operations in Illinois is inaccurate. In any event, TCRG does not contend at all with the Tribunal's correct conclusion that even under that stipulation, the Tribunal was not required to ignore TCRG's business connections through its lease of the plane and through Sennett of Franklin Monroe.

¶ 58    Additionally, neither *Superior Aircraft* nor *Fall Creek* support TCRG's contention that its leases for use of the aircraft are irrelevant to the substantial nexus question. True, the fact that a lease is a taxable use does not alone answer the constitutional question. Nevertheless, leases are a use of the property and an examination of the use under the lease was appropriate for evaluation of nexus. See *Truck Renting & Leasing Ass'n v. Commissioner of Revenue*, 746 N.E.2d 143, 1449-50 (Mass. 2001) (holding "presence of [taxpayer's] vehicles in [the state] through its lease agreements established the requisite physical connection" to impose excise tax on income earned).

¶ 59    TCRG also misstates the holding of *Superior Aircraft*, claiming that because that case considered flights made only by the taxpayer, it "expressly rejected" the relevancy of the leased use of the plane. But the emphasis on flights by the taxpayer, which alone were sufficient to establish nexus, did not make flights by lessees irrelevant. And *Superior Aircraft* made no "express" finding on that point. 734 S.W.2d at 507.

¶ 60    With respect to *Fall Creek*, TCRG asserts that whether the taxpayer had operational control of the aircraft should determine whether nexus is satisfied. But the operational control issue in *Fall Creek* arose with respect to whether the taxpayer "used" the aircraft for purposes of imposing use tax in the first instance—and not regarding nexus. *Fall Creek Construction Co., Inc.*, 109 S.W.3d at 171-72. As noted above, TCRG does not challenge its use of the aircraft in this state.

¶ 61    TCRG also claims that flights during the so-called "break-in period"—when the aircraft was undergoing maintenance at Midway—should be disregarded. But TCRG fails to support this argument other than by citation of arguments it raised below. There, it argued that the aircraft's presence at Midway was "coincidental." We reject that categorization. TCRG intentionally selected Jen-Air due to its capabilities to perform necessary maintenance. TCRG's other suggestion below—that maintenance of the plane should not factor into the substantial nexus question—is rebutted by cases that consider maintenance for nexus. See *M&T Charters, Inc. v. Comm'n of* Revenue, 533 N.E.2d 1359, 1360-61, 1363 (Mass. 1989) (considering maintenance of yacht at in-state shipyard); *H.K. Porter Co., Inc. v. Commonwealth of Pennsylvania*, 534 A.2d 169, 170-71 (Pa. 1987) (considering maintenance of aircraft performed at in-state airport).

¶ 62    Finally, TCRG claims that businesses will be reluctant to use Illinois service providers and Illinois airports if this court affirms the Tribunal. But TCRG provides no support for this argument beyond speculation. TCRG fails to show that Illinois airports or Illinois service providers generally are at risk of being avoided if we affirm the Tribunal's correct application of nexus law. Moreover, this court has rejected similar predictions of economic catastrophe. See *Moline School District No. 40 Board of Education v. Quinn*, 2015 IL App (3d) 140535, ¶ 28 ("The fact that Elliot Aviation

was contemplating an expansion out of state does not change our conclusion that it is similarly situated to other FBOs and businesses in Illinois who have to compete in the market with companies whose home states do not require property taxes.").

¶ 63                                    2. Fairly Related

¶ 64    The fairly related element of *Complete Auto* "asks only that the measure of the tax be reasonably related to the taxpayer's presence or activities in the State" and "requires no detailed accounting of the services provided to the taxpayer on account of the activity being taxed." *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 199-200 (1995); see also *Brown's Furniture*, 171 Ill. 2d at 428. *Brown's Furniture* held that this requirement was met because "Illinois provided services which facilitate Brown's Furniture's sale of furniture within the State." *Id*. at 429. Specifically, the court noted that the taxpayer benefited from "public roads, police protection, a judicial system and all the other 'usual and usually forgotten advantages conferred by the State's maintenance of a civilized society.' " *Id.* at 429 (quoting *Jefferson Lines, Inc.*, 514 U.S. at 200).

¶ 65    TCRG's aircraft made extensive use of Illinois airports, regulated and funded by the State, with dozens of takeoffs and landings, and weeks at Midway for repairs provided by an Illinois company. Also, just as the taxpayer in *Brown's Furniture* gained economic benefits through its use of the roadways for deliveries, TCRG's lease arrangements benefited from Illinois's "entire physical and social infrastructure." *Id.* These benefits, in addition to the airport services regulated and funded by the State, included Franklin Monroe's management of TCRG's aircraft from the

Franklin and Guggenheim's Illinois offices and employees. Just like in *Brown's Furniture*, Illinois's services facilitated TCRG's operations here.

¶ 66    TCRG's argument that it does not engage in deliveries like the taxpayer in *Brown's Furniture* is beside the point. Just as in *Brown's Furniture*, TCRG's economic activity was enhanced through the services that Illinois provides. Indeed, these services aided the operation of the aircraft that generated TCRG's lease income. For this reason, the leases were not "immaterial." Also, TCRG's argument that it did not engage in business operations in Illinois is, as noted above, an overstatement of the record evidence.

¶ 67    Further, contrary to TCRG's contention, the facts here are not akin to those of *American River Transportation v. Bower*, 351 Ill. App. 3d 208, 212-13 (2004). There, the "fairly related" prong of *Complete Auto* was not satisfied with respect to a use tax on fuel and supplies for tugboats traveling in Illinois waterways because those boats neither docked nor fueled in the state. *Id.* at 211-13. In reaching that determination, the court distinguished the facts from those involving aircraft that "use ground facilities" and "pay the appropriate taxes." *Id.* at 213. Indeed, TCRG used Illinois airports' ground services and received benefits that the taxpayer in *American River* did not. *Id.*

¶ 68    Finally, TCRG argues that because the amount of tax liability per flight is greater here than in *Irwin*, the tax is not fairly related to the services that Illinois provides. But TCRG cites no authority that supports looking to the amount of tax liability per use in a state to determine whether the fair relation test is satisfied. As to the imposition of use tax generally, this court has recognized that the tax "is measured by the purchase price of an item, without regard to the amount of use the

item will receive." *Archer Daniels Midland Co. v. Department of Revenue*, 170 Ill. App. 3d 1014, 1023 (1988).

¶ 69    In sum, the Tribunal correctly concluded that the record did not demonstrate a basis for TCRG's claim of constitutional immunity from taxation here, either regarding its activity with a substantial nexus with Illinois or the fair relation of the tax to the services provided by Illinois.

¶ 70                                   B. Abatement

¶ 71    TCRG also seeks an abatement of the late filing and late payment fines assessed by the Department.

¶ 72    In *Horsehead Corp. v. Department of Revenue*, our supreme court stated that

> "[t]he existence of reasonable cause justifying abatement of a tax penalty is a factual determination that is to be decided on a case-by-case basis. [Citation.] If the record contains evidence to support the decision to impose penalties, it should be affirmed. [Citation.] The determination as to whether reasonable cause exists in justifying the abatement of a tax penalty will be reversed if the decision was against the manifest weight of the evidence and if the opposite conclusion was clearly evident. [Citation.]" 2019 IL 124155, ¶ 46.

¶ 73    Section 3-8 of the Uniform Penalty and Interest Act states that penalties "shall not apply if the taxpayer shows that his failure to file a return or pay tax at the required time was due to reasonable cause. Reasonable cause shall be determined in each instance in accordance with the rules and regulations promulgated by the Department." 35 ILCS 735/3-8 (West 2022).

¶ 74    Pursuant to that provision, a Department regulation states that the "determination of whether a taxpayer acted with reasonable cause shall be made on a case by case basis taking into account all pertinent facts and circumstances." 86 Ill. Admin. Code § 700.400(b) (2019). The "most important factor to be considered in making a determination to abate a penalty will be the extent to which the taxpayer made a good faith effort to determine his proper tax liability and to file and pay his proper liability in a timely fashion." *Id.* Under the rule, a "taxpayer will be considered to have made a good faith effort to determine and file and pay his proper tax liability if he exercised ordinary business care and prudence in doing so." *Id.* § 700.400(c). Whether a taxpayer exercised ordinary business care and prudence is "dependent upon the clarity of the law or its interpretation and the taxpayer's experience, knowledge, and education." *Id.*

¶ 75    Here, the key issues are substantial nexus and fair relation. As the Tribunal correctly noted, there was not a lack of controlling authority on these issues. Regarding nexus, it has been established law for decades that only "more than the slightest physical presence" is required and that the physical presence of offices and employees in the state is not required. See *Brown's Furniture*, 171 Ill. 2d at 421-25. Regarding fair relation, it has similarly been long established that courts do not apply a transactional approach of looking at a "detailed accounting of services provided to the taxpayer" in relation to the activity taxed. See *id.* at 428-29. Consequently, TCRG's arguments, which contravened this authority, were not based on a "good faith" determination of tax liability.

¶ 76    Nor does TCRG otherwise establish its good faith effort to determine its tax liability in a timely fashion. On this point, TCRG cites *Horsehead Corp.*, 2019 IL 124155 ¶¶ 48, 51, noting that

the court there held that evidence of a taxpayer's decision-making process and guidance-seeking is not "specifically required." Nevertheless, the court still acknowledged the Department's regulation that a good faith effort in determining liability is the most important factor in determining reasonable cause. *Id.* ¶¶ 48, 50. *Horsehead* determined that the tribunal's decision to uphold the Department's imposition of late payment and filing penalties was against the manifest weight of the evidence, based, in part, on the "unique factual circumstances surrounding the manufacturing process at issue in [the] case," and the lack of a specific statutory definition and caselaw for guidance on the issue. *Id.* ¶¶ 51-52. Here, because there was not a lack of guidance, whether TCRG made a good faith effort remains a key consideration. TCRG, however, failed to demonstrate a good faith effort.

¶ 77 Rather, TCRG points to its conduct after it was notified of its liability. It cites several communications with the Department in which its counsel disputed that it owed tax. These were not good faith efforts to determine whether it owed the tax in the first instance. Moreover, although TCRG claims that the Department "struggled" to identify the legal standard, the record demonstrates that the Department explained that nexus was satisfied. This correspondence belies TCRG's assertion that the "Department did not adequately inform TCRG of the basis" for the tax.

¶ 78 Rather than show good faith efforts on its part, TCRG instead focuses on a single email correspondence from the Department stating that the nexus standard required the "slightest physical presence." Despite this phrasing in that email, the email references the Department's May 18, 2021, formal letter, sent two weeks prior, that sets out the correct "more than a slightest presence" standard, which TCRG fails to note. TCRG also complains that, in that letter, the

Department discussed requirements for an exemption, but TCRG again fails to note that the letter also properly addressed the nexus standard.

¶ 79    TCRG fails to articulate how the other purported "missteps" of the Department demonstrate its own reasonable cause in not timely paying the tax. These include a purported due process violation for issuing a notice of liability one week after the notice of initiation of the audit (for which no corresponding legal claim appears in TCRG's brief) and initially pursuing TCRG's parent for the tax owed. But the Department argues that the record reveals circumstances surrounding these issues attributable to TCRG's actions, such as TCRG purportedly submitting a misleading return, which contributed to the short time span. Regardless, these fact questions are not pertinent to the reasonable cause standard and would make the case unsuitable for resolution on summary judgment. Finally, TCRG broadly claims it had "no business operations" in Illinois, when that is not supported by the record and, even for the period it was supported by stipulation, was rejected by the Tribunal and this court. We conclude that the Tribunal correctly rejected TCRG's request for abatement.

¶ 80                              C. Attorney Fees

¶ 81    Finally, TCRG claims that, should it prevail, it should be awarded attorney fees under section 7 of the Taxpayers' Bill of Rights Act, which permits an award of attorney fees when the Department "has made an assessment *** without reasonable cause." 20 ILCS 2520/7 (West 2022).

¶ 82    As discussed above, it is settled law that the substantial nexus standard requires "only more than a slightest physical presence" and does not depend on the presence of in-state offices and

employees. Given TCRG's many contacts with Illinois through its representatives and leases, the Department, in addition to being correct, was not "without reasonable cause" to conclude TCRG had the requisite nexus.

¶ 83    In arguing that the Department did not have reasonable cause, TCRG repeats many of the same contentions raised in support of its request for an abatement of penalties, *i.e.*, asserting that it had no operations in Illinois, citing the Department's email referencing "slightest presence," noting the Department's letter discussing an exemption, and arguing its due process rights were "minimized." For the same reasons that these bases do not support reasonable cause for TCRG's failure to pay the tax, they do not support an argument that the Department was without reasonable cause to assess the tax. Finally, TCRG's claim—that the Department "expanded the law," by looking to the conduct of TCRG's representatives in this state—is again incompatible with the longstanding precedent recognizing such conduct as an appropriate consideration in determining nexus. For all these reasons, TCRG has not shown entitlement to an award of fees.

¶ 84                              III. CONCLUSION

¶ 85    For the foregoing reasons, we affirm the judgment of the Tribunal.

¶ 86    Affirmed.